Huey B. WRIGHT, Plaintiff–Appellant,

v.

Harold SMITH and Thomas A. Coughlin,
III, Defendants–Appellees.

No. 607, Docket 93–2415.

United States Court of Appeals,
Second Circuit.

Submitted Dec. 7, 1993.

Decided April 6, 1994.

**497**

plaintiff in the SHU without a hearing. Finally, while we agree with the District Court that Commissioner Coughlin was not personally involved in confining the plaintiff without a hearing, and thus cannot be held liable for damages, Superintendent Smith was personally responsible since he had received at least constructive notice of the violation. We therefore affirm as to Coughlin and reverse and remand as to Smith.

William G. Bauer, Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, NY, submitted a brief for plaintiff-appellant.

Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Nancy A. Spiegel and Martin A. Hotvet, Asst. Atty. Gens., Albany, NY, submitted a brief for defendants-appellees.

Before: NEWMAN, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

JON O. NEWMAN, Chief Judge:

The primary question on this appeal is whether an inmate's extended confinement without a hearing in a correctional facility's Special Housing Unit (SHU) violates a Fourteenth Amendment liberty interest. Huey B. Wright, formerly an inmate at Attica Correctional Facility, appeals from the June 11, 1993, judgment of the District Court for the Western District of New York (Kenneth R. Fisher, Magistrate Judge) granting defendants' motion for summary judgment and dismissing with prejudice Wright's complaint under 42 U.S.C. § 1983 (1988) against defendants Harold Smith, the Superintendent of Attica Correctional Facility, and Thomas Coughlin, the Commissioner of the New York Department of Correctional Services. We conclude that Wright's complaint alleging involuntary confinement in an SHU for 67 days without a hearing stated a cause of action under section 1983 for violation of a protected liberty interest. We also conclude that the defendants are not shielded by qualified immunity because both the case law of this Circuit and New York regulations clearly prohibited the extended confinement of the

### Background

On July 17, 1983, Wright, while an inmate at Attica Correctional Facility, was assaulted by two other inmates in his own cell. After receiving numerous stitches for facial wounds at the prison hospital, he was moved to the SHU on the same day based on charges that he violated prison rules 100.10 (prohibiting inmates from assaulting other prisoners) and 100.11 (prohibiting inmates from engaging in fighting). *See* Docket Entry # 21, Exh. E. A disciplinary hearing held on July 20, 1983, resulted in both charges being dismissed because Wright was "allegedly assaulted [and] was defending himself." *Id.*, Exh. D. Wright was nonetheless retained in the SHU. The Magistrate Judge found that "although plaintiff's admission to ... [the] SHU may have been dually motivated, his retention there was solely for protective reasons." Decision at 3.

Under New York regulations, Wright was entitled to a hearing on his protective confinement in the SHU within 14 days of his admission. In 1983, New York's regulations provided, in pertinent part:

> Where an inmate does not consent to a protective admission to a special housing unit, or where the inmate requests reassignment and such reassignment is not made within two weeks of the date of request, a *proceeding will be held within 14 days* of the date of such admission or such request to determine if there is substantial evidence that protective custody is necessary.

7 N.Y.C.R.R. § 304.3(c) (1986) (emphasis added). Although Wright was kept in the SHU for 67 days, he never received the required hearing on his protective confinement. The Magistrate Judge noted some

mention in Wright's records of a Superintendent's Proceeding held July 17, 1983, but he concluded that no such proceeding actually occurred. *See* Decision at 6, 8.

On August 8, 1993, Wright, through Prison Legal Services, petitioned a New York state court for a writ of habeas corpus pursuant to Article 70 of the New York Civil Practice Law and Rules. After receiving Wright's petition, alleging illegal detention and the deprivation of a myriad of rights connected with a hearing, defendant Smith took no action on his own to investigate the legality of Wright's detention in the SHU or whether Wright had received a hearing. Instead, Smith forwarded the writ to state counsel on August 26, 1983. A hearing on the writ in New York state court on September 14, 1983, was adjourned until October 19. Wright was released from the SHU on September 22, 1983, having spent 67 days there. On October 19 an order of stipulation was entered in New York state court. The stipulation restored Wright's good time credits, and "expunge[d] from [his] institutional files [ ] any reference to the Superintendent's Proceeding of July 17, 1983 . . . ." Docket Entry # 21, Exh. L., at 1–2. Thereafter, Wright brought this suit in the District Court, seeking damages for his SHU confinement.

## Discussion

### A. Liberty Interest in Not Being Placed in an SHU

■ The initial issue is whether appellant has a liberty interest, protected by the Due Process Clause, in not being placed in an SHU. The Supreme Court has made clear that, with respect to a prisoner serving a sentence, not every aspect of restrictive confinement within a penal institution impairs a constitutionally protected liberty interest. *See Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Moreover, as the Court has pointed out, "administrative segregation," imposed for such purposes as protection of the prisoner's own safety, does not impair an interest "independently protected by the Due Process Clause." *Id.* at 468, 103 S.Ct. at 870; *see also Russell v. Scully,* 15 F.3d 219, 222 (2d Cir.1994) (suggesting that in absence of state law creating

liberty interest, "strictly administrative" confinement in SHU after hearing and pending appeal does not violate due process). Nevertheless, *Helms* also makes clear that, under certain circumstances, state law can create a constitutionally protected liberty interest. Unfortunately, the Court's choice of words in articulating the relevant circumstances has created some confusion as to the Court's meaning.

■ What is clear is that a liberty interest is created whenever state law identifies "specified *substantive* predicates" as prerequisites for the imposition of administrative segregation. *Id.,* 459 U.S. at 472, 103 S.Ct. at 871 (emphasis added). For example, in *Helms,* Pennsylvania had provided by regulation that administrative segregation could be imposed upon a determination of "a threat of a serious disturbance" or "a serious threat to the individual or others." *Id.* at 470 n. 6, 103 S.Ct. at 871 n. 6. *Cf. Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984) (no liberty interest impaired by placement in restrictive confinement for purposes of reclassification where regulation accorded officials "unfettered discretion"). What is less clear is whether a liberty interest arises from state procedural requirements. Generally, state procedural requirements, without more, do not create federally enforceable liberty interests, *see, e.g., Olim v. Wakinekona,* 461 U.S. 238, 250–51 & n. 12, 103 S.Ct. 1741, 1748 & n. 12, 75 L.Ed.2d 813 (1983) (state prison regulations requiring a particular kind of hearing did not create a liberty interest, where Administrator was left with unfettered discretion to transfer prisoner); *Maust v. Headley,* 959 F.2d 644, 648 (7th Cir.1992) ("[S]tate-created procedural rights do not, standing alone, constitute protected liberty interests."); such requirements remain available for enforcement in state court. However, some language in *Helms* has opened up the possibility that, in the context of restrictive confinement within a prison, procedural requirements may create a liberty interest. In ruling that Pennsylvania had created a liberty interest, the Court said that the State "has used language of an unmistakably mandatory character, requiring that certain *procedures* 'shall,' 'will,' or 'must' be employed . . . and that adminis-

trative segregation will not occur absent specified substantive predicates...." *Id.,* 459 U.S. at 471–72, 103 S.Ct. at 871 (emphasis added).

■ We think the Court did not mean to constitutionalize all aspects of state procedure bearing on placement in restrictive confinement. The quoted sentence follows a discussion of the virtues of "procedural guidelines to channel the decision-making of prison officials." *Id.* at 471, 103 S.Ct. at 871. Thus, the "procedures" that can trigger a liberty interest in this context are not the full panoply of procedural rights that a state might accord, such as the number of witnesses allowed, or the number of hours or days of preparation time, but instead refer to procedures that "channel decision-making," *i.e.,* that establish the substantive predicates for the decision-makers' action. *Cf. Olim,* 461 U.S. at 250–51, 103 S.Ct. at 1748 (where procedures did not channel decision-making, no liberty interest created); *Sher,* 739 F.2d at 81 (same). If procedures of this latter sort are mandatory and not merely a matter of guidance, they trigger a liberty interest. *See, e.g., Rogers v. Okin,* 738 F.2d 1, 7 (1st Cir.1984) (mandatory language prescribing substantive predicates required before patients in mental hospital could be forcibly medicated created liberty interest); *Parks v. Watson,* 716 F.2d 646, 657 (9th Cir.1983).

In *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.), *cert. denied,* 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988), we made two rulings pertinent to our current issue. First, we ruled that New York's regulations specifying the circumstances under which administrative segregation could be imposed sufficiently established mandatory substantive predicates under *Helms* to create a liberty interest. *Id.* at 36. But we also ruled that the creation of a liberty interest was not so clear from the face of these regulations as to overcome a prison official's defense of qualified immunity as to a confinement imposed in 1985. *Id.* If a liberty interest in not being placed in administrative segregation was not

clearly established in 1985, it surely had not been established in 1983 when Wright was confined to an ·SHU. The prison officials therefore have qualified immunity with respect to Wright's claims that he was unconstitutionally placed into an SHU.

B. Liberty Interest in Not Being Confined for Extended Period Without a Hearing

■ The second and more substantial issue is whether Wright's continued confinement in an SHU for 67 days without any hearing to determine whether grounds existed for such extended confinement impaired a constitutionally protected liberty interest. It is arguable that, notwithstanding *Helms,* the Fourteenth Amendment itself creates a liberty interest in not being kept in restrictive confinement within a prison for an extended period of time without any hearing. In declining to accord independent constitutional protection to placement in administrative segregation, *Helms* pointed out that this is the sort of confinement "that inmates should reasonably anticipate receiving at some point in their incarceration." 459 U.S. at 468, 103 S.Ct. at 870. But the reasonable anticipation of being *placed* in administrative segregation does not oblige a prisoner to accept *maintenance* in such segregation for a prolonged period of time without any hearing.[1] And while the Court was understandably reluctant to find in the Due Process Clause itself requirements that might impinge on the "day-to-day administration of a prison system," *id.* at 470, 103 S.Ct. at 870, there is little reason to believe that prison administrators would be disrupted by a due process requirement that at some point in time, confinement in administrative segregation cannot be perpetuated without a hearing. Indeed, in *Helms,* once the Court determined that state law had created a liberty interest for a transferred inmate, it had no difficulty concluding that due process in this context required "some notice of the charges against him and an opportunity to present his views

---

1. *Cf. Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979) ("We may assume, arguendo, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere deten-

tion pursuant to a valid warrant but in the face of repeated protests of innocence will *after the lapse of a certain amount of time* deprive the accused of 'liberty ... without due process of law.' ") (emphasis added).

to the prison official charged with deciding whether to transfer him to administrative segregation" within "a reasonable time following an inmate's transfer." *Id.* at 476 & n. 8, 103 S.Ct. at 873 & n. 8; *see also Russell v. Coughlin,* 910 F.2d 75, 77–78 (2d Cir.1990).[2]

In this case, we need not rest decision on the Due Process Clause independently because New York has required, in mandatory terms, that no administrative segregation last more than 14 days without a hearing. Though this is not the type of state law requirement that establishes a substantive predicate for placement in restrictive confinement, neither is it merely a procedural detail incident to such placement of the sort that is normally enforceable only in state court. Instead, what New York has done, not surprisingly, is to recognize that at some point a prisoner confined in administrative segregation must have his status examined by the prison authorities and be accorded some sort of hearing as to the grounds for his continued confinement. Wherever that point might be placed as a purely constitutional requirement in the absence of state law requirements, there can be no doubt that when a state mandates such a hearing no later than 14 days after admission to the SHU and a prisoner's confinement continues without a hearing for 67 days, a protected liberty interest has been impaired.

### C. Qualified Immunity

■ The doctrine of qualified immunity shields state officials from liability where they did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). We have held that in determining whether a right was clearly established at the time the defendants acted, a court should consider:

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir. 1993); *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). With regard to the officials' claim to qualified immunity for impairment of the liberty interest in the pending case, we note that the New York regulation itself gave the officials clear notice that confinement could not be continued beyond 14 days without a hearing. Moreover, we had said as early as 1977 that prison authorities could confine an inmate for his own safety "as long as a hearing follows as soon as is practicable." *See McKinnon v. Patterson,* 568 F.2d 930, 939 n. 10 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Whether or not that requirement would suffice to overcome a qualified immunity defense as to a modest period of confinement without a hearing, it surely leaves prison officials in no doubt that they have acted unconstitutionally where confinement has continued, without a hearing, for 67 days. *Compare Russell,* 910 F.2d at 79 (rejecting qualified immunity defense for 10 days of "keeplock" confinement) *with Gittens v. Le Fevre,* 891 F.2d 38, 42–43 (2d Cir.1989) (upholding qualified immunity de-

---

**2.** The defendants' effort to distinguish this case from *Russell, supra,* on the ground that there was a disciplinary hearing in this case while there was no hearing at all in *Russell* is unavailing. The disciplinary hearing led to the dismissal of *both* charges against Wright; hence, his continued confinement cannot be justified on the basis of any disciplinary violation. As in *Russell,* the plaintiff here never received a hearing on his administrative confinement.

We also note that an arguably relevant recent decision involving another prisoner named Russell, *Russell v. Scully,* 15 F.3d 219 (2d Cir.1993)

*(Russell I), modified on petition for rehearing* (2d Cir.1994) *(Russell II),* is in fact not on point. In that case, we denied section 1983 relief on qualified immunity grounds to a prisoner who had received two full disciplinary hearings, both finding him guilty of assault and violent conduct. *See Russell I,* 15 F.3d at 220–21; *Russell II,* 15 F.3d at 223. We held that although the rulings had been administratively reversed because of the hearing officer's failure to adequately examine the credibility of confidential informants, there had been no clearly established right to such examination, and the officer was therefore protected by qualified immunity.

fense for seven days of "keeplock" confinement). *See also Helms,* 459 U.S. at 476, 103 S.Ct. at 873 (an inmate subject to administrative segregation must receive, at a minimum, notice and an opportunity to present his views to a decisionmaker within "a reasonable time" in order to satisfy the Due Process Clause); *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983) (confinement in an SHU for seven days as a punishment triggers right to some due process protection, as does confinement in quarters for 14 days as a punishment); *cf. Russell II,* 15 F.3d at 233 (official protected by qualified immunity where no Supreme Court or Second Circuit cases clearly establish procedures required to make independent assessment of witness's credibility).[3]

## D. Personal Involvement

■ It is well settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *see also Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required."), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). As the District Court properly noted, a defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutionally protected liberty interests in several ways:

The defendant may have directly participated in the infraction.... A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong.... A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.... Lastly, a supervisory official may

be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event....

*Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). In addition, supervisory liability may be imposed where an official demonstrates "gross negligence" or "deliberate indifference" to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place. *McCann,* 698 F.2d at 125; *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989).

■ Wright's argument that Commissioner Coughlin was personally involved in the violation here rests on a contention that Coughlin received a letter from the plaintiff describing the conditions of his confinement. In the letter, which was addressed not to Coughlin but to Governor Cuomo, Wright did complain generally about the conditions in which he was confined, but nowhere stated that he was being retained in the SHU without a hearing, or that he had been deprived of any rights connected with a hearing. *See* Docket Entry # 27, Exh. A. Hence, Coughlin was never put on actual or constructive notice of the violation. *Cf. McCann,* 698 F.2d at 125 (noting that Commissioner had either actual or constructive notice of unconstitutional procedures being implemented, and therefore could not escape personal responsibility). The plaintiff does not allege that Coughlin created a policy or custom under which the violation occurred or acted negligently in managing subordinates who caused the violation. *See Williams, supra.* Nor can Coughlin be held personally responsible simply because he was in a high position of authority in the prison system. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[P]laintiff's claim for monetary damages against [the Commissioner] requires a showing of more than linkage in the prison chain of command."); *McKinnon,* 568 F.2d at 934 ("The fact that [defendant Commissioner] was in a high position of authority is an insufficient basis for the imposition of personal liability."). We therefore affirm the

---

**3.** We note that both *Helms* and *McCann* were decided before the violation that took place in

this case. *Helms* was decided February 22, 1983, and *McCann* was decided January 6, 1983.

**502**

District Court's summary judgment ruling with respect to Coughlin.

 The Magistrate Judge's conclusion that Superintendent Smith was not personally involved in depriving Wright of a hearing rests largely on his finding that Wright's habeas corpus petition served on Smith on August 8, 1983, failed to give Smith notice that Wright had not received a hearing. While it is true that the petition does not specifically allege that Wright was denied a hearing, it does allege that he was denied a host of rights connected with a hearing, including: (1) written notice at least twenty-four hours in advance of the hearing; (2) disposition of the hearing within seven days of confinement; (3) an impartial hearing officer; (4) the right to be present when witnesses testify; (5) the right to be advised of the evidence against him; and (6) the right to comment on said evidence prior to the disposition by the hearing officer. *See* Wright Petition for a Writ of Habeas Corpus, Docket Entry # 21, Exh. L, ¶ 11. Since, as the defendants concede, Wright was denied any hearing on his administrative confinement, each of the allegations in Wright's complaint was true.

Wright and his attorneys may have framed his petition to allege only the deprivation of rights connected with a hearing, rather than a total denial of a hearing, based on the possibility that a "hearing" had occurred, though Wright had not been apprised of it or permitted to attend. Indeed, the Magistrate Judge noted that it was not clear whether Wright had been present at the July 20, 1983, disciplinary hearing, at which both charges against him were dismissed. *See* Decision at 3; Docket Entry # 21, Exh. D. We also note Attica's history of providing prisoners with summary "hearings" that seem designed to simply gloss over the required process. *See, e.g., Williams,* 781 F.2d at 321, 324 (Attica prisoner received eight-minute hearing in which his request to call a witness was denied; citing New York cases involving similar deprivations at Attica). In any event, the petition alleging that Wright was denied notice of a hearing and its outcome, an impartial hearing officer, the right to be present, and the right to be informed of

and respond to the evidence against him put Smith on notice that, if the allegations were true, Wright received no meaningful hearing at all. We conclude, therefore, that Smith was "[a] supervisory official [who], after learning of the violation through a report or appeal, ... failed to remedy the wrong," *id.* at 323, and cannot escape liability by denying personal involvement.

### Conclusion

Accordingly, we affirm the dismissal as to Coughlin, but reverse as to Smith and remand for further proceedings consistent with this opinion.